Monique Olivier (SBN 190385)
monique@os-legal.com
Christian Schreiber (SBN 245597)
christian@os-legal.com
George A. Warner (SBN 320241)
george@os-legal.com
OLIVIER & SCHREIBER PC
475 14th Street, Suite 250
Oakland, CA 94612
Telephone: (415) 484-0980
Facsimile: (415) 658-7758

Phillip R. Poliner (SBN 156145)
Phillip@FinemanPoliner.com
Neil B. Fineman (SBN 177915)
Neil@FinemanPoliner.com
FINEMAN POLINER LLP
155 North Riverview Drive
Anaheim Hills, California 92808-1225
Telephone: (714) 620-1125
Facsimile: (714) 701-0155

*Attorneys for Plaintiff and the Putative Class*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE HARVEY, on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>WORLD MARKET, LLC, COST PLUS WORLD MARKET, LLC, and DOES 1-10 inclusive,<br><br>     Defendants. | Case No. 3:25-cv-01242-CRB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Charles R. Breyer<br><br>Date: February 6, 2025<br>Time: 10:00 a.m.<br>Location: Courtroom 6 – 17th Floor |

**<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION ..................................................................................................1

II.    PROCEDURAL HISTORY ....................................................................................2

III.   STATEMENT OF FACTS .....................................................................................3

    A.  Plaintiff Purchased the Chairs After Relying on the $429.99 Price Advertised ..................3

    B.  Plaintiff's Expert Will Opine that Drip Pricing Wastes Consumers' Time and Allows Businesses to Charge Higher Total Prices for the Same Goods ..............................6

IV.    LEGAL STANDARD .............................................................................................7

V.     ARGUMENT ..........................................................................................................8

    A.  Plaintiff Relied on the Initial Advertised Price of the Jarle Chair Set ................................8

        i.  Binding Case Law and the Court Have Rejected Defendants' Premise that Reliance Is Negated by Belated Disclosure of the Full Price ..................................11

    B.  Plaintiff Suffered Additional Injuries "as a Result of" Defendants' Use of Drip Pricing Regardless of Whether She Relied on the Initial List Price ...........................16

        i.  The UCL, FAL, and CLRA Do Not Require Reliance Unless Plaintiff's Theory of Causation Depends on Reliance to Connect Defendants' Unlawful Practices to Plaintiff's Injury .........................................................................16

        ii.  Defendants' Use of Drip Pricing Likely Allowed Them to Charge Ms. Harvey More than She Would Have Paid ..................................................................................19

        iii.  Harvey Spent Money on Fees that Were Unlawful .......................................................21

        iv.  For Her CLRA Claim, Plaintiff Can Show Defendants' Practices Resulted In Transactional and Opportunity Costs ..........................................................................22

    C.  At Minimum, the Court Should Allow Plaintiff the Opportunity to Conduct Discovery that Could Result in Potentially Dispositive Evidence ....................................24

VI.    CONCLUSION......................................................................................................25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:25-CV-01242-CRB

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Allergan USA Inc. v. Imprimis Pharmaceuticals, Inc.*,
2017 WL 10526121 (C.D. Cal. Nov. 14, 2017) ................................................................18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...........................................................................................................7

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1946) .........................................................................................................22

*California Medical Assn. v. Aetna Health of California Inc.*,
14 Cal. 5th 1075 (2023).................................................................................................16, 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...........................................................................................................7

*Charbonnet v. Omni Hotels & Resorts*,
2020 WL 7385828 (S.D. Cal. Dec. 16, 2020) .......................................................13, 14, 15

*Chowning v. Tyler Technologies, Inc.*,
2025 WL 3496690 (N.D. Cal. Dec. 5, 2025).............................................................10, 16

*Clayworth v. Pfizer, Inc.*,
49 Cal. 4th 758 (2010)......................................................................................17, 19, 21

*Franz v. Beiersdorf, Inc.*,
745 F. App'x 47 (9th Cir. 2018)...................................................................................21, 22

*Freeman v. Time, Inc.*,
68 F.3d 285 (9th Cir. 1995) ..............................................................................................15

*Hall v. Marriott International, Inc.*,
344 F.R.D. 247 (S.D. Cal. 2023) ...........................................................................13, 14, 15

*Herrera v. Zumiez, Inc.*,
953 F.3d 1063 (9th Cir. 2020) ..........................................................................................12

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) .....................................................................................11, 14

*Hollingsworth Solderless Terminal Co. v. Turley*,
622 F.2d 1324 (9th Cir. 1980) ............................................................................................7

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009).................................................................................................*passim*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:25-CV-01242-CRB

*Kagan v. Gibraltar Savings & Loan Assn.*,
   35 Cal.3d 582 (1984) ............................................................................................................17, 18

*King v. National General Insurance Company*,
   2025 WL 1294657 (N.D. Cal. May 5, 2025) .................................................................................22

*KT Enterprises LLC v. Comp360, LLC*,
   751 F. Supp. 3d 999 (C.D. Cal. 2023) .........................................................................................18

*Kwikset Corp. v. Superior Court*,
   51 Cal. 4th 310 (2011) ...................................................................................................*passim*

*Leslie v. Grupo ICA*,
   198 F.3d 1152 (9th Cir. 1999) ........................................................................................................7

*Lona's Lil Eats, LLC v. DoorDash, Inc.*,
   2021 WL 151978 (N.D. Cal. Jan. 18, 2021) .............................................................................18, 19

*Mansfield v. StockX LLC*,
   2025 WL 2811791 (N.D. Cal. Oct. 3, 2025) .........................................................................10, 12, 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .........................................................................................................................7

*Medrazo v. Honda of North Hollywood*,
   205 Cal. App. 4th 1 (2012) ...........................................................................................................22

*Meyer v. Sprint Spectrum L.P.*,
   45 Cal. 4th 634 (2009) ...................................................................................................*passim*

*Mirkin v. Wasserman*,
   5 Cal. 4th 1082 (1993) ...................................................................................................................19

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ........................................................................................................7

*Rasmussen v. Apple Inc.*,
   27 F. Supp. 3d 1027 (N.D. Cal. 2014) ..........................................................................................17

*Scilex Pharmaceuticals Inc. v. Sanofi-Aventis U.S. LLC*,
   2021 WL 11593043 (N.D. Cal. Aug. 16, 2021) ...........................................................................18

*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) ..........................................................................................................7

*Texas Partners v. Conrock Co.*,
   685 F.2d 1116 (9th Cir. 1982) ......................................................................................................24

iii

*Tomlin v. Boeing Co.*,
  650 F.2d 1065 (9th Cir. 1981) ..................................................................................12

*Troester v. Starbucks Corp.*,
  5 Cal. 5th 829 (2018) ...............................................................................................22

*Troyk v. Farmers Group, Inc.*,
  171 Cal. App. 4th 1305 (2009) ...............................................................................17

*Veera v. Banana Republic, LLC*,
  6 Cal. App. 5th 907 (2016) ...............................................................................*passim*

*Victor v. R.C. Bigelow, Inc.*,
  2014 WL 1028881 (N.D. Cal. Mar. 14, 2014) .......................................................17

*Watkins v. MGA Entertainment, Inc.*,
  550 F. Supp. 3d 815 (N.D. Cal. 2021)......................................................................17

*White v. Ultramar, Inc.*,
  21 Cal. 4th 563 (1999)...........................................................................................14, 15

**Statutes**

Cal. Bus. & Prof. Code § 17200 ......................................................................................2

Cal. Bus. & Prof. Code § 17500 ......................................................................................2

Cal. Civ. Code § 1750......................................................................................................2

Cal. Civ. Code § 1770(a)(29)..............................................................................2, 12, 14

**Rules**

Fed. R. Civ. P. 56........................................................................................................7, 24

**Regulations**

29 C.F.R. § 785.47..........................................................................................................22

Fed. Trade Comm'n, Rule on Unfair or Deceptive Fees,
  90 Fed. Reg. 2066 (Jan. 5, 2025).....................................................................*passim*

**Other Authorities**

Fed. Trade Comm'n, "That's the Ticket" Workshop: Staff Perspective (May 2020).....................20

S.B. 478, 2023-24 Leg. Sess., Third Assemb. Floor Analysis (Sept. 7, 2003)..........................6, 15

S.B. 478, 2023-24 Leg. Sess., Sen. Floor Analysis (Sept. 11, 2023) ...........................................21

iv

## I.   **<u>INTRODUCTION</u>**

When denying Defendants' Motion to Dismiss, the Court allowed Defendants to conduct limited discovery into the question of whether Plaintiff "actually rel[ied] on the initial display price of the chairs that she purchased from World Market when she purchased them," and to move for summary judgment if there was "no genuine dispute of fact as to Harvey's reliance." Defendants now seek summary judgment, contending that discovery "conclusively establishes" Plaintiff did not rely on the initial display price of the Jarle Chair Set.

Plaintiff did, in fact, rely on the initial advertised price when deciding to purchase the chairs. Plaintiff had a budget of $500 when purchasing patio furniture. While shopping online, Plaintiff, like all online shoppers, was exposed to hundreds with possible options—she was presented with hundreds of outdoor furniture options on World Market's site alone. Yet, during her search, she *only* clicked on products advertised for less than $500. When Plaintiff clicked on the Jarle Chair Set, it was advertised for $429.99. Plaintiff committed to purchase the Chair Set because she thought the chairs were $429.99—within her budget. After she found out the chairs would cost $529.94—outside her budget—she vacillated but ultimately decided to go forward because she did not want to spend more time looking for a chair set. As Plaintiff's expert explains, this type of scenario is precisely why businesses delay the disclosure of the true cost of their wares. The unlawful practice of drip pricing lures consumers who otherwise would not have considered a product and causes them to pay more than they otherwise would have been willing to spend. Plaintiff has testified that she initially considered the Jarle Chair Set because it was listed as costing under $500, and would not have committed to the Chair Set had she learned immediately that the Chair Set cost over $500.

Further, Plaintiff does not need to show she relied on the initial display price to prevail on any of her claims. The Consumers Legal Remedies Act ("CLRA"), Unfair Competition Law ("UCL"), and False Advertising Law ("FAL") all require Plaintiff to show she was injured "as a result of" a prohibited practice. The California Supreme Court has repeatedly emphasized that reliance is just *one* means of showing causation, and that reliance is only necessary *if* a plaintiff proceeds under a theory that she was defrauded, because "reliance is the causal mechanism of

1

fraud." Drip pricing is an unlawful practice that harms consumers even when consumers know they are not being told the full price upfront, and Plaintiff specifically was harmed "as a result of" World Market's use of drip pricing regardless of whether she specifically relied on the veracity of the initial advertised price. First, Plaintiff can prove she was charged a higher price because of Defendants' delayed disclosure of the full price. As Plaintiff's expert, Prof. Sebastien Bradley, explains, drip pricing provides businesses with a market advantage: more consumers consider their goods because they appear cheaper than they in fact are. Prof. Bradley's research has found that when businesses are forced to stop using drip pricing, they actually *lower* their prices. And he opines that had World Market complied with the law, it would have likely reduced the price of the Chair Set to remain competitive. Second, because World Market did not properly advertise its mandatory fees, those fees were illegal, and Plaintiff was harmed by paying those unlawful fees. For the CLRA claim, Plaintiff can show yet additional injuries: World Market wasted Plaintiff's time by making it more difficult for her to find the true price of the Chair Set, a form of transactional cost, and World Market's tactics diverted her from finding a better possible deal, an opportunity cost. Because Harvey can show she suffered harm "as a result of" Defendants' practice through these many routes, summary judgment cannot be granted.

## II. PROCEDURAL HISTORY

Plaintiff filed this lawsuit on October 3, 2024. Dkt. 1-3. The Second Amended Complaint was filed on February 2, 2025. Dkt. 1-25. She has brought claims on behalf of herself, a class of similarly situated persons, and the general public against Defendants based on violations of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, which prohibits companies from "offering a price for a good or service that does not include all mandatory fees or charges," with the exception of certain government-imposed charges and "[p]ostage or carriage charges that will be reasonably and actually incurred." Cal. Civ. Code § 1770(a)(29). *See also id.* at § 1770(a)(9). She has also brought claims under the Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.*, which prohibits the use of drip pricing as an unfair and unlawful practice, and the False Advertising Law ("FAL"), Bus. & Prof. Code § 17500, *et seq.*, which

prohibits the use of drip pricing because it involves the dissemination of untrue and misleading statements. Dkt. 1-25 at ¶¶ 49-66.

After the case was removed, Defendants moved to dismiss. Dkt. 10. The Court denied that motion on May 9, 2025. Dkt. 28. The Court, relying heavily on prior cases where consumers asserted they were defrauded by misrepresentations discovered after a purchase is completed, concluded that "plaintiff must allege that she relied on the defendant's alleged omission." *Id.* at 4. *See also id.* at 3 (describing Plaintiff's claims as "essentially fraudulent omission claims"). The Court also explained that "[w]hen a business engages in drip pricing, consumers are left with two choices: they can proceed with their purchase after discovering the initially undisclosed fees or decide not to buy the product they wanted." *Id.* at 7.

The Court then instructed the parties to conduct limited factual discovery into the question: "Did Harvey actually rely on the initial display price of the chairs that she purchased from World Market when she purchased them?" *Id.* at 12. The Court allowed World Market to file an early summary judgment motion with respect to that issue if World Market believed such a motion was appropriate. *Id.* Defendants took the deposition of Plaintiff on July 8, 2025, after Plaintiff provided Defendants with the record of her computer and phone search history.

## III.     STATEMENT OF FACTS[1]

### A.  Plaintiff Purchased the Chairs After Relying on the $429.99 Price Advertised

In late August 2024, Plaintiff decided to buy furniture to put on her patio. Decl. of Valerie Harvey ("Harvey Decl.") ¶ 3. Plaintiff is a makeup artist working on television and movie sets, and she was also trying to start her own business representing other makeup and hair talent. *Id.*

---

[1] Plaintiff has not been allowed to conduct full discovery. Thus, although some facts have been identified during the limited discovery, much is still unknown. For example, the parties have not engaged in any discovery related to Defendants' pricing strategy, including the Defendants' decision to charge separate oversized item fees and a separate shipping and handling charge for its items, and Defendants' decision not to incorporate those costs into the list price of the Jarle Chair Set and other products on their website. Declaration of George A. Warner ("Warner Decl.") ¶¶ 3-6. If World Market made a business decision to charge additional mandatory fees that were not disclosed in its products' list prices, Plaintiff does not know World Market's justification for that decision. *Id.* at ¶ 4 (b)-(d). Plaintiff also does not know when World Market first started charging the two mandatory surcharges, and whether the list price of the Chair Set (and other items subject to these surcharges) was lowered when those mandatory surcharges were introduced. *Id.* at ¶ 4 (a), (d). This information could help show that Plaintiff paid more for the Chair Set "as a result of" Defendants' unlawful practices. *Id.* at ¶ 6.

She had limited time on her hands because of her busy work schedule. *Id.* She decided that she wanted to buy two chairs, and decided she wanted to spend no more than $220 to $250 per chair, or $500 in total. *Id.*

Plaintiff started to search for patio furniture on her computer before going to bed, at around 1:20 a.m. on September 9, 2024; she spent around 20 minutes browsing. Harvey Decl. ¶¶ 4-7, Ex. A at Nos. 1-85. She ultimately made her purchase the next afternoon, at around 2:30 p.m., after spending another 45 minutes looking for furniture on her computer. *Id.* at Ex. A at Nos. 86-137. During her search, she also looked for furniture from multiple online retailers, including Ikea, Amazon, Target, Wayfair, Melrose Discount Furniture, and Patio World. *Id.* at ¶¶ 7, 9. At one point during her search, she visited a page on Wayfair that displayed "Loveseat Patio Sofas & Sectionals Under $500 You'll Love." *Id.* at ¶ 6, Ex. A at No. 32-34.

Plaintiff saw hundreds of different options during her search. She went to 85 unique webpages. Harvey Decl. Ex. A. On many of the webpages she visited, she saw dozens of different furniture options. *Id.* at ¶¶ 5, 11, *See also Id.* at Ex. A at Nos. 114-19, Ex. B (showing screenshot of google search page). Although she viewed hundreds of options, she went to webpages dedicated to 12 specific pieces of furniture. *Id.* at ¶¶ 7, 9. She viewed six options at Wayfair, two options at Amazon, a set from Target, two outdoor sets from Melrose Discount Furniture. *Id.* Ms. Harvey testifies that none of these were priced above $500, and as of January 8, 2025, none of those pages advertise the furniture at prices of over $500. *Id.*

Plaintiff ultimately decided on the Jarle Molded Resin Outdoor Chair Set from Defendants, after visiting the World Market Website. She first saw the Jarle Chair Set while going through six webpages titled "Outdoor Furniture Sale - World Market," which collectively showed several hundred different furniture options for her to consider. Harvey Decl. ¶ 11. On the last page, she saw the Jarle Chair Set. *Id.* at ¶ 12. The Chair Set was advertised for $429.99, which was within her budget. *Id.*

At 2:15 p.m., she clicked on the webpage dedicated to the Jarle Chair Set. Harvey Decl. ¶ 13, Ex. A at No. 120. On this page, the Chair Set was advertised for $429.99. *Id.* Defendants admit "that the initial display price for the [Jarle Chair Set] did not incorporate the oversized item

4

surcharge in the price." Warner Decl. Exs. A & B ( Resp. to RFA No. 3). In fact, on the upper right-hand corner of the page, the site stated: "Free Shipping on $49+ Orders." Harvey Decl. ¶ 13. *See also* Decl. of Holly Bauer ("Bauer Decl.") Ex. A. Harvey then visited a few other pages on the World Market website, including a page titled "Outdoor Furniture Sale." Harvey Decl. ¶ 14, Ex. A at Nos. 121-29.

At around 2:21 p.m., she returned to the Jarle Chair Set page after browsing other pages on World Market's website, and she decided to buy the Chair Set. Harvey Decl. ¶ 15, Ex. A at No. 130. At this point, she had visited seven retailers' websites, searched Google for patio furniture, and visited webpages for over 10 different patio furniture options. *Id.* at ¶¶ 6-9, 11, 18, Ex. A. The Chair Set was within Plaintiff's budget. *Id.* at ¶ 12. Further, she thought that it looked like furniture that could have been designed by Ray and Charles Eames, whose designs she admired, but are usually quite expensive. *Id.* at ¶ 14. When she added the Chair Set to her cart, a popup showed that her total was $429.99. *Id.* at ¶ 15. *See also* Bauer Decl. Ex. B.

Plaintiff then went to complete her purchase, at 2:23 p.m., by visiting the "My Cart" webpage on Defendants' site. *Id.* at Ex. A at No. 131. When she did so, Defendants for the first time disclosed two additional mandatory fees that increased the total price of the chairs: an "Oversized Item Surcharge" of $49.95 and a "Shipping and Handling" charge of $50.00. *Id.* at ¶ 16. Collectively, these charges increased the total price of the chairs by more than 20 percent, and nearly $100. *Id.* It put the Chair Set beyond her planned budget. *Id.* at ¶ 17. Plaintiff was annoyed and felt duped because she had already put in time and effort to find furniture within budget that would look good, and she had identified an option that she thought met all her needs. *Id.* After debating whether to spend more of her time, or more of her money, Plaintiff decided to spend the latter, and completed the purchase. *Id.*

Had World Market properly advertised the price of the chairs, Plaintiff believes she would have never considered the Jarle Chair Set. Harvey Decl. ¶ 18. She further testifies that had she been presented with a more affordable option that fit her needs, she would have taken that option. *Id.* at ¶ 14.

### B. Plaintiff's Expert Will Opine that Drip Pricing Wastes Consumers' Time and Allows Businesses to Charge Higher Total Prices for the Same Goods

There is an established scientific literature on the economic effects of drip pricing for both businesses and consumers. Decl. of Sebastien Bradley ("Bradley Decl.") ¶ 9. This literature concludes that when businesses fail to incorporate mandatory fees in an upfront list price for a product and only disclose those fees at subsequent stages of a purchase, *businesses benefit and consumers suffer*. *Id.* Many studies have found that drip pricing affects consumers' perception of a product's price and alters consumers' behaviors. *Id.* at ¶¶ 16-19. Numerous academics and federal regulators have concluded that consumers presented with transparent (honest) pricing spend less during a purchase than they do when surcharges are belatedly disclosed. *Id.* at ¶¶ 9, 12, 15-18; RJN Ex. A, Fed. Trade Comm'n, Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2066, 2079 (Jan. 5, 2025), https://www.federalregister.gov/d/2024-30293/p-306. They have further concluded that consumers are also less likely to purchase a product at all when surcharges are disclosed transparently. Bradley Decl. ¶ 19. There are multiple reasons for this behavior. Bradley Decl. ¶ 19; RJN Ex. A, 90 Fed. Reg. at 2079. One is that "consumers attach value to things they perceive to be theirs"—because they have tried a sweater on or imagined how a chair set would look on their patio—"and, once consumers begin the purchase process, their perception shifts so that stopping the transaction feels like a loss." RJN Ex. A, 90 Fed. Reg. at 2079. *See also* RJN Ex. C, S.B. 478, 2023-24 Leg. Sess., Third Assemb. Floor Analysis 2 (Sept. 7, 2003) (noting that drip pricing "take[s] advantage of lock-in or other forms of situational market power").

These well understood behaviors explain why businesses use drip pricing. Drip pricing, after all, is profitable; it provides a competitive advantage. When businesses are allowed to make mandatory surcharges less transparent, those businesses can extract higher total prices for the goods and services they sell. Bradley Decl. ¶¶ 9(b), 11-12. By contrast, when businesses are forced to incorporate those surcharges into the upfront price, research—including research conducted by Prof. Bradley—shows that businesses end up *reducing* the price of their goods to preserve demand. *Id.* at ¶ 12. *See also* RJN Ex. A, 90 Fed. Reg. at 2080, 2149. Prof. Bradley, based on his research and the literature, believes that had World Market incorporated the "Oversized Item Surcharge" and the "Handling" fees into the initially advertised price for the

chair, as required by law, Plaintiff would have likely paid a *lower* total price of the chairs she purchased, because World Market would have to lower the total price of the Jarle Chair Set. *Id.* at ¶¶ 2(e), 25.

Prof. Bradley will also testify that drip pricing imposes a clear transactional cost on consumers. By making it harder to identify the true cost of an item, drip pricing makes price comparison harder for consumers, leading to "sub-optimal" purchases. Bradley Decl. ¶ 26.

## IV.    <u>LEGAL STANDARD</u>

To prevail on their motion, Defendants must "show[] that there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Under this standard, summary judgment must only be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[I]f the nonmoving party produces enough evidence to create a genuine issue of material fact," the motion cannot be granted. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). The Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is therefore not appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir. 1980). If evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the Court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). Nor can the Court make credibility determinations regarding the evidence offered on summary judgment. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing *Matsushita*, 475 U.S. at 587).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:25-CV-01242-CRB

## V.   **ARGUMENT**

Defendants' Motion for Summary Judgment cannot be granted because a reasonable jury could conclude that Plaintiff relied on the initial advertised price of the Jarle Chair Set when she subsequently purchased the product, and she would not have purchased the chair set but for the initial misrepresentation of its price. Separately, judgment cannot be granted because Plaintiff can show she was harmed "as a result of" Defendants' unlawful practices even had she not relied on the veracity of the initial advertised price. Plaintiff can show she would have paid less for the Chair Set had Defendants advertised the total price up front, as the law requires, and can show she paid illegal fees. For her CLRA claim, Plaintiff can show Defendants' obfuscation of the price made it more difficult for her compare prices, and resulted in her losing the chance to purchase an alternative set of chairs, an opportunity cost that is a cognizable injury.

### A.  **Plaintiff Relied on the Initial Advertised Price of the Jarle Chair Set**

Plaintiff has proffered evidence that allows a jury to conclude that she would not have purchased the chairs—"the injury-producing conduct"—had she not relied on Defendants' $429.99 list price for the Jarle Chair Set. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009).

Plaintiff set a budget of no more than $220-$250 per chair, and wanted to buy two chairs. Harvey Decl. ¶ 3. During Plaintiff's search, she saw hundreds of possible patio furniture options. *Id.* at ¶¶ 5-9, 11. *See also id.* at Ex. B. Of these hundreds of options, Plaintiff's search history shows that she visited 12 webpages dedicated to specific pieces of furniture. *Id.* at ¶¶ 7, 9. Plaintiff believes that all of these pieces of furniture cost less than $500 at the time; all are now advertised for less than $500. *Id.*[2] During her search, Plaintiff looked at a webpage that expressly identified items less than $500. Harvey Decl. ¶ 6. When she clicked on the Jarle Chair Set, the set was advertised for $429.99. *Id.* at ¶¶ 12-13. The World Market website also advertised free shipping for orders over $49. *Id.* at ¶ 13.

Plaintiff made the decision to purchase the Chair Set thinking the Chair Set would cost exactly what was advertised: $429.99 plus tax. *Id.* at ¶ 14. Once she found out that she would have to pay two additional fees, and the total price was, in fact, well over $500, she "vacillated"

---

[2] One furniture set is no longer for sale.

8

about whether to proceed with the purchase. Warner Decl. Ex. D, Harvey Dep. at 57:12-24. She ultimately decided to proceed, because she did not want to have to search for an alternative. Harvey Decl. ¶ 17. Plaintiff has testified that she would not have purchased the Jarle Chair Set had World Market initially advertised the chairs for $529.94. Harvey Decl. ¶ 18.

Defendants have not proffered evidence to the contrary. And Defendants did not take steps during discovery to understand whether Plaintiff relied on the advertised price of the Jarle Chair Set during her purchase of the Chair Set. During her deposition, which lasted under two hours, Defendants never asked Plaintiff basic questions about the transaction: whether she had a budget; when she decided to purchase the Chair Set; whether she relied on the initial advertised price of the Chair Set when adding the Chair Set to her cart; why she decided to proceed with the purchase once she learned about the additional fees. Warner Decl. Ex. D, Harvey Dep. at 46:15-65:25, 66:12-67:9. *See also* Dkt. 32 (Transcript of Hearing at 20:15-21-15 [J. Breyer discussing questions to ask Plaintiff and facts that could be relevant to whether or not Plaintiff was harmed by misrepresentation in price]).

A jury looking at the evidence could conclude that Plaintiff relied on the initial advertised price when deciding to purchase the Chair Set. The California Supreme Court has explained what is needed to show reliance in a series of decisions interpreting the UCL. "It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision," *In re Tobacco II Cases*, 46 Cal. 4th at 326; a misrepresentation need not be the "sole or even the decisive cause of the injury-producing conduct." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 327 (2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 328); and "an allegation of reliance is not defeated merely because there was alternative information available to the consumer-plaintiff, even regarding an issue as prominent as whether cigarette smoking causes cancer." *In re Tobacco II Cases*, 46 Cal. 4th at 328. *Kwikset* specifically instructs that a

> consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section 17204 by [showing] . . . that he or she would not have bought the product but for the misrepresentation. That [proof] is sufficient to [show] causation—the purchase would not have been made but for the misrepresentation.

51 Cal. 4th at 330.

Binding case law confirms that a plaintiff can learn that the misrepresentation is false before finalizing the transaction and still show she relied on that representation: "the question of reliance and causation does not rest as a matter of law on whether plaintiffs knew the actual price of the items they purchased at the moment money was exchanged." *Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 920 (2016). In *Veera*, multiple consumers were drawn into Banana Republic by signs advertising 40 percent off its clothing. "[T]he advertising led them to enter the store, to shop, to select items, to decide to purchase them, and to stand in line to make the purchases. Their reliance on the advertising informed their decision to buy" clothing from defendants. *Id.* After learning that the items they intended to purchase were not in fact on sale, each plaintiff proceeded to purchase some of the items they had selected. (They did not purchase others.) *Id.* at 912-13. In one case, the plaintiff's daughter was already wearing the dress; the other plaintiff felt that to purchase nothing "would be a complete and utter waste of energy and time." *Id.* at 913.

Because the specific statutory prohibition on drip pricing schemes has only been effective since July 2024, there have been few decisions discussing how the causation requirements in the CLRA, UCL and FAL should be applied now that CLRA expressly prohibits the practice. However, in addition to this Court's decision resolving Defendants' Motion to Dismiss, two other Courts in this district have addressed belated disclosure of mandatory fees. *Chowning v. Tyler Technologies, Inc.*, No. 4:25-CV-04009-YGR, 2025 WL 3496690, at *3 (N.D. Cal. Dec. 5, 2025); *Mansfield v. StockX LLC*, 25-cv-04250-RFL, 2025 WL 2811791, at *7 (N.D. Cal. Oct. 3, 2025). These cases correctly evaluate reliance under the relevant decisions. In *Mansfield*, Judge Lin concluded that reliance must be "evaluated at the moment of the initial omission, i.e., when the consumer views the initial price communication, and not later upon eventual disclosure of the true price." *Mansfield*, 2025 WL 2811791, at *6. Both Judge Lin and Judge Gonzalez Rogers, quoting this Court, focused on the need to identify an interpretation of the law that would not make meaningless the California Legislature's decision to ban drip pricing, and its statement that such prohibition should be broadly enforced. *Id.* at *7; *Chowning*, 2025 WL 3496690, at *3.

A factfinder, applying the facts and law correctly, could easily conclude, based upon her sworn testimony and the analysis of her website visiting history, that Plaintiff relied on the initial $429.99 price for the chair set—just as the *Veera* plaintiffs relied on the "40 percent off" advertisement to start shopping at the Banana Republic store. A jury could further conclude that Plaintiff "would not have purchased the [Jarle Chair Set] absent this misrepresentation," *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1105 (9th Cir. 2013), just as the *Veera* plaintiffs would not have purchased some full-priced clothing had they not been lured into the store by a sign saying the items were on sale. *Veera,* 6 Cal. App. 5th at 919-20. Given Plaintiff—like all online shoppers—was being presented with hundreds of possible furniture options while shopping, yet only clicked on pages for furniture advertised for less than $500, a jury could reasonably conclude that Plaintiff would likely have never clicked on the page for the Chair Set had it been advertised properly as costing over $500. She testified that she was not even considering chairs in excess of $500, and likely would have scrolled right by the Chair Set given the list price started with a "$5--" and not $4--." *See* Harvey Decl. ¶ 18. A reasonable jury could also conclude that even had she visited the page for the Chair Set, she would have likely moved on to search for an in-budget alternative, rather than decide to purchase the Chair Set. *Id.* In other words, a jury could reasonably conclude that absent World Market initially advertising the Chair Set for $429.99, Plaintiff "would not have purchased the goods in question"; this is "everything *Kwikset* requires to [show] an economic injury under the UCL and FAL." *Hinojos*, 718 F.3d at 1105.

### i. Binding Case Law and the Court Have Rejected Defendants' Premise that Reliance Is Negated by Belated Disclosure of the Full Price

The crux of Defendants' argument appears to be that Plaintiff could not have relied on the initial advertised price of the Jarle Chair Set, because she continued with the purchase of the Jarle Chair Set *after* Defendants disclosed that the purchase would require payment of additional fees. Dkt. 43 at 15-18, 20. Defendants' idea—that "in the case of an alleged misrepresentation or omission, disclosure of the true facts defeats reliance"—is not supportable by the case law.[3]

---

[3] Defendants' brief does not cite as support any case law discussing the causation element of the UCL, FAL, or CLRA when attempting to discredit the conclusion in *Mansfield* that "reliance must be evaluated . . . when the consumer views the initial price communication." Dkt. 43 at 14.

Dkt. 43 at 20. Binding case law, in fact, states the opposite: "the question of reliance and causation does not rest as a matter of law on whether plaintiffs knew the actual price of the items they purchased at the moment money was exchanged."[4] *Veera*, 6 Cal. App. 5th at 920. *See also Mansfield v. StockX LLC*, No. 25-CV-04250-RFL, 2025 WL 2811791, at *6 (N.D. Cal. Oct. 3, 2025) (noting that an "initial omission may have already influenced the consumer's behavior" by the time the additional fees are disclosed); Dkt. 28 at 7-8. *Veera* is a "controlling interpretation of state law," and Defendants have not provided any "persuasive data" to suggest "that the California Supreme Court would decide otherwise." *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1066 (9th Cir. 2020) (quoting *Tomlin v. Boeing Co.*, 650 F.2d 1065, 1069 n.7 (9th Cir. 1981)). Nor can they. *Veera* properly interprets *In re Tobacco II Cases*: the misrepresentation need not be "the sole or even the predominant or decisive factor influencing his conduct . . . It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision." 46 Cal. 4th at 326. "[A]n allegation of reliance is not defeated merely because there was alternative information available to the consumer-plaintiff." *Id.* at 328.

Defendants themselves seem not to believe their own premise. As they explain in their motion:

> One can imagine other circumstances in which the reliance requirement would be no bar to a claim, such as where a consumer scrambles to get in queue for sought-after concert tickets only to be presented with exorbitant service fees when it is their turn to buy, feeling they had no choice but to proceed or risk the tickets selling out before by the time they tried another seller. In fact, this very situation (involving Taylor Swift tickets) was a key impetus for the enactment of § 1770(a)(29).

Dkt. 43 at 24. This hypothetical concertgoer *was aware* of the "exorbitant service fees when it was their turn to buy." *Id.* Defendants appear to nonetheless concede that the consumer in the hypothetical relied on the initial list price when buying the concert tickets—it was part of what got them into the queue in the first place. *Id. See also* Dkt. 28 at 6 (noting "Harvey's purchase of

---

[4] Although Defendants describe *Veera* in hyperbolic fashion, *see* Dkt. 43 at 24, there was nothing exceptional requiring the *Veera* plaintiffs to go through with their planned purchases. Waiting in line at checkout is routine. So too is being with an embarrassed teenager or having to tell a child that you will not be purchasing something they desire. The fact that the *Veera* plaintiffs *did not* buy most of the items they had brought to checkout suggests that they were not under some exceptional form of pressure to complete their purchases. 6 Cal. App. 5th at 912-13, 920.

12

armchairs from World Market does not appear meaningfully different than a group of friends' purchase of concert tickets").

Defendants imply that there is some distinction between the hypothetical concertgoer and Harvey because the concertgoer "fe[lt] they had no choice to proceed or risk the tickets selling out," Dkt. 43 at 24, and at various points imply without citation that the concept of "undue pressure" or "undue influence" has some legal relevance to this case. *See id.* at 14, 18. But the case law has not tied liability to the question of whether a consumer was pressured or coerced after being provided with incorrect information. The case law instead reflects that liability can be established regardless of the plaintiff's motivation for ultimately proceeding with a transaction *after* learning an earlier representation was misleading or incomplete. *See, e.g.*, *Veera*, 6 Cal. App. 5th at 912 (noting that one customer did not want to make her daughter take off the outfit she was already wearing); *id.* at 913 (noting another customer purchased one sweater, but not other selected items, because he had "invested all that time and effort, and just to leave with nothing would be a complete and utter waste of energy and time"); *In re Tobacco II Cases*, 46 Cal. 4th at 307-08 (discussing the addictive quality of nicotine). *See also* Bradley Decl. ¶ 19 (discussing academic research explaining various factors that result in consumers stick with products after learning of additional costs); Harvey Decl. ¶ 17 (noting she did not want to have to search for an item again after making her decision). The reasons for continuing with the purchase are thus not what matters; what matters is that the earlier understanding of an incorrect price put them in a position to choose to continue with a purchase (or, instead, suffer the loss of their time and effort to get to that point). *Veera*, 6 Cal. App. 5th at 920. Regardless of the reason why the consumer proceeded with the transaction once they understood the true purchase price, the earlier representation's veracity "played a substantial part, and so had been a substantial factor, in influencing his decision." *In re Tobacco II Cases*, 46 Cal. 4th at 328.

As with its Motion to Dismiss, Defendants urges the Court to rely upon two *pre-amendment* CLRA cases, *Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247 (S.D. Cal. 2023) and *Charbonnet v. Omni Hotels & Resorts*, No. 20-CV-01777-CAB-DEB, 2020 WL 7385828 (S.D. Cal. Dec. 16, 2020), which this Court has already rejected:

> Though the facts in *Charbonnet* and *Hall* are facially similar to the facts in this case, the reasoning of those courts regarding reliance is inapplicable in light of the Honest Pricing Law, which added the CLRA provision at issue in this case— section 1770(a)(29). Indeed, applying the *Charbonnet* and *Hall* courts' reasoning to section 1770(a)(29) would undermine the very purpose of that provision.

Dkt. 28 at 6. This same reasoning holds true at this stage of the proceedings.

There are additional reasons why the Court should not rely on *Hall* and *Charbonnet*. First, these decisions cannot be squared with *Veera*, *Hinojos*, and *In re Tobacco II Cases*. Unlike *Hall* and *Charbonnet*, *Veera*, *Hinojos*, and *In re Tobacco II Cases* are binding on this Court.[5] *Charbonnet* does not address *Veera* at all. But the core reasoning of *Charbonnet*—"[t]he fact that Plaintiff completed her reservation and paid the higher total price, knowing it was more than the advertised daily rate, shows that the addition of taxes and fees ultimately had no effect on her decision to book a room there"—misstates the proper inquiry. The question is not whether the addition of taxes and fees effected a change of behavior; the question is whether the initial omission of those fees was " a cause, though not the only cause, of their economic harm." *Veera*, 6 Cal. App. 5th at 920. *Hall* addresses *Veera* but misreads it. *Hall* repeatedly states that *Veera* discussed whether deception is "cured" by later disclosures, 344 F.R.D. at 265, even though *Veera* decision does not once suggest that later truthful disclosure could negate prior reliance on a false representation. *See* 6 Cal. App. 5th at 919-21. *Hall* claims a "critical" factor in *Veera* was that the shoppers "invested 40 minutes or more in the shopping process before learning that the price was higher than originally advertised," 344 F.R.D. at 266, but in fact, *Veera* only discusses the how much time one of the plaintiffs spent shopping, and does not address this purportedly critical factor at all in its analysis. 6 Cal. App. 5th at 912, 920.

The idea that *eventual* disclosure of a full price negates reliance is not just at odds with binding case law, it is at odds with the Legislature's conclusion that consumers are affected by the belated disclosure of complete price information, and the ample scientific research backing this

---

[5] Defendants suggest that the Court should rely on *Hall* and *Charbonnet* because courts presume the California Legislature is "fully aware of the prior judicial construction" when it amends a statute. Dkt. 43 at 19-20, quoting *White v. Ultramar, Inc.,* 21 Cal. 4th 563, 572 (1999). *White* and other cases discussing this presumption refer to decisions by the California Supreme Court, not unpublished federal District Court cases and cases published in the Federal Rules Decisions reporter, which, as its name suggests, focuses on cases interpreting federal procedural rules. To the extent the California Legislature should be presumed aware of prior judicial construction, it should be presumed to be aware of *Veera*.

14

conclusion. *See, e.g.,* RJN Ex. C at 2 (quoting White House analysis describing how junk fees "take advantage of lock-in or other forms of situational market power"); Bradley Decl. ¶ 19. The FTC, in regulating drip pricing on the federal level, has similarly explained why belated disclosure is insufficient:

> Several behavioral studies explain why consumers cannot reasonably avoid making errors when the true price is not displayed upfront. Behavioral research shows that consumers who first learn of a lower price do not properly adjust their calculations when additional fees are added, thereby underestimating the total price. It also shows that consumers attach value to things they perceive to be theirs and, once consumers begin the purchase process, their perception shifts so that stopping the transaction feels like a loss. The research shows that consumers who already have invested in an endeavor, such as by taking time to make selections on a travel or live-event ticket website, continue that endeavor even if they would pay less if they began again elsewhere.

RJN Ex. A, 90 Fed. Reg. at 2079.

Finally, the facts of *Hall* and *Charbonnet*, though facially similar, are materially different. In *Charbonnet*, the court's opinion depended on the fact that the purported misrepresentation— the daily rate—was placed directly next to the "total price for the room," inclusive of fees. 2020 WL 7385828, at *3. *Charbonnet* does not address belated disclosure at all: *Charbonnet* concluded that the purported misrepresentation was not plausible, because the total price was provided simultaneously. *Id.*[6] In *Hall*, the court noted that the plaintiff "testified that he knew the advertised room rate on the first page would not be the total." 344 F.R.D. at 266. Plaintiff, by contrast, believed that $429.99 was the total pre-tax price. Harvey Decl. ¶ 14. Why would she not? Defendants admit that the Oversized Item Surcharge was not included in the initial advertised price, Warner Decl. Exs. A & B (Resp. to RFA No. 3). Furthermore, World Market advertised free shipping for purchases over $49, and when she added the Chair Set to her cart, a pop-up appeared showing a total price of $429.99. Harvey Decl. ¶ 13; Bauer Decl. ¶ 5, Ex. B.

---

[6] Defendants also briefly discuss *Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir. 1995). This case, which well predates contemporary California law regarding causation in UCL and FAL actions, also hinges on the conclusion that the defendant made "no such false representation." *Id.* at 290. Plaintiff notes that Defendants' representation that the author of the S.B. 478 "expressly referenced *Freeman v. Time, Inc.*" is incorrect. The *opposition* to the bill referenced that case. Donald Decl., Ex. M at 7.

**B. Plaintiff Suffered Additional Injuries "as a Result of" Defendants' Use of Drip Pricing Regardless of Whether She Relied on the Initial List Price**

Although Plaintiff *did* rely on the initial list price for the Chair Set offered by Defendants to her detriment, Plaintiff should be allowed to proceed with her claims so long as she can show she was harmed "as a result of" the unlawful practice. Because drip pricing harms a consumer even when she does not rely on the initial advertised price, Plaintiff can show she was harmed by Defendants' violation of law without proving reliance.

**i. The UCL, FAL, and CLRA Do Not Require Reliance Unless Plaintiff's Theory of Causation Depends on Reliance to Connect Defendants' Unlawful Practices to Plaintiff's Injury**

The CLRA, FAL, and UCL all require a showing that the harm suffered come "as a result of" the unlawful practice. In other words, the exposure to the unlawful practice must "caus[e] or result[] in some sort of damage." *Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 641 (2009). (discussing "as a result of" language in the CLRA). *See also Kwikset*, 51 Cal. 4th at 326 (noting that interpretation of "as a result of" language discussed in *Meyer* "mirrors" interpretation of the same language under UCL and FAL). "The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of *a causal connection or reliance* on the alleged misrepresentation." *Kwikset*, 51 Cal. 4th at 326 (emphasis added).

Where a plaintiff's injury depends on a theory that she was individually deceived, establishing causation requires a showing of reliance on the misrepresentation, "in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *Kwikset*, 51 Cal. 4th at 326-27 (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 306). *See also id.* at 326 n.9 (noting that the "theory of the case is that Kwikset engaged in misrepresentations *and* deceived consumers" (emphasis added)); *Cal. Med. Assn. v. Aetna Health of Cal. Inc.*, 14 Cal. 5th 1075, 1096 (2023) (noting *Kwikset* and *Tobacco II Cases* were "fraud case[s]").

But if Plaintiff asserts harms caused by Defendants that do not depend on a "fraud theory," causation does *not* require reliance.[7] The California Supreme Court has recognized that

---

[7] Plaintiff recognizes that at the Motion to Dismiss stage, the Court posited that reliance was a necessary element of the claim, and Plaintiff provided the Court no briefing to consider whether reliance was necessary to show causation. Dkt. 22 at 16; Dkt. 28 at 4. The plaintiffs in *Mansfield* and *Chowning* also assumed that they would have to show reliance. *Chowning v. Tyler Technologies*, 4:25-cv-04009, Dkt. 29 at 18 (N.D. Cal. Aug. 8, 2025); *Mansfield v. StockX LLC*,

16

"[t]here are doubtless many types of unfair business practices in which the concept of reliance . . . has no application." *In re Tobacco II Cases*, 46 Cal. 4th at 325 n.17. In those cases, all a plaintiff must show is "causation (i.e., plaintiff lost money *because of* defendants' unfair competition)." *Kwikset*, 51 Cal. 4th at 326 (quoting *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1349 (2009)). The California Supreme Court has repeatedly allowed claims under the UCL, FAL, and CLRA to proceed <u>absent reliance</u> where plaintiffs set forth an alternative theory of causation.[8] *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 788 (2010) (allowing claim to proceed where plaintiff "paid more than they otherwise would have [for defendants' pharmaceuticals] because of a price-fixing conspiracy in violation of state law"); *Cal. Med. Assn.*, 14 Cal. 5th at 1096 (in case where practice was "attacked not as fraudulent but as violative of [other] laws").

The fact that an unlawful practice may include misrepresentation does not mean that reliance is *per se* required. Less than four months prior to *In re Tobacco II Cases*, the California Supreme Court in *Meyer* explained how causation could be shown by a consumer on a theory that does not depend on being defrauded, even though the consumer was challenging an unlawful business practice that involved misrepresentations. 45 Cal. 4th at 641-43. The *Meyer* court contains an extensive discussion of *Kagan v. Gibraltar Savings & Loan Assn.*, 35 Cal.3d 582 (1984), and explains how, in *Kagan*, "the plaintiff chose a financial institution, Gibraltar Savings and Loan Association (Gibraltar), that had *represented* it would charge no management fees for an individual retirement account." *Meyer*, 45 Cal. 4th at 641 (emphasis added). After the financial institution informed plaintiff that it would "be charging a $7.50 fee for administering the

3:25-cv-04250, Dkt. 30 at 5-8 (N.D. Cal. Aug. 8, 2025).
[8] Admittedly, the case law after *In re Tobacco II Cases* and *Kwikset* is replete with examples of court decisions—including those quoted by Defendants—that dramatically overstate the reliance requirement set forth in *Kwikset* and *In re Tobacco II Cases* and contradict California Supreme Court guidance. *Compare, e.g., Victor v. R.C. Bigelow, Inc.*, 2014 WL 1028881 at *5 (N.D. Cal. Mar. 14, 2014) ("The 'as a result' language means that actual reliance must be shown."), *Rasmussen v. Apple Inc.*, 27 F. Supp. 3d 1027, 1043 (N.D. Cal. 2014) ("[B]oth the CLRA and UCL require plaintiffs to prove reliance.") *with In re Tobacco II Cases*, 46 Cal. 4th at 325 n.17 ("There are doubtless many types of unfair business practices in which the concept of reliance, as discussed here, has no application."); *Kwikset*, 51 Cal. 4th at 326 & n.9 (recognizing that the statute allows "causation or reliance" and limiting discussion to cases proceeding "on a fraud theory involving false advertising"). *See also Watkins v. MGA Ent., Inc.*, 550 F. Supp. 3d 815, 833 (N.D. Cal. 2021) (conflating the Rule 9(b) particularity requirement for claims that "sound in fraud" with substantive California law).

account," the *Kagan* plaintiff, through counsel, "demanded that Gibraltar not deduct the fees, that it cease its *misleading advertising practices*, and that it rectify the charging of this fee to other similarly situated bank customer." *Id.* (emphasis added). Although Kagan succeeded in preventing Gibraltar from deducting "allegedly fraudulent administrative fee from her account," the *Meyer* court explained that Kagan nonetheless suffered damage "as a result of" Gibraltar's practices, because she had to expend "time and money threatening Gibraltar with a lawsuit," a form of transaction cost. *Id.* at 643. The causal link between the unlawful conduct and Kagan's injury does not depend upon Kagan being deceived by Gibraltar when deciding to use Gibraltar for her IRA; she could have learned of Gibraltar's representation *after* choosing Gibraltar for her IRA and nonetheless have expended time and money as a result of Gibraltar's alleged unlawful conduct.[9] Because the theory of harm does not depend on her being deceived by the misrepresentation, the theory did not require Kagan to show reliance.

In the years since *In re Tobacco II Cases* and *Kwikset*, a number of judges in this district have "join[ed] the growing chorus of courts that have held that individual reliance is not required" to show causation under the UCL and FAL in all cases involving misrepresentations. *Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, No. 21-CV-01280-JST, 2021 WL 11593043, at *6 (N.D. Cal. Aug. 16, 2021) (Tigar, J.) (cleaned up), *See also KT Enters. LLC v. Comp360, LLC*, 751 F. Supp. 3d 999, 1003 (C.D. Cal. 2023) (listing cases reaching view that competitor plaintiffs need not allege their own reliance). In those cases, courts have recognized that competitors can be harmed by a business's misrepresentation because consumers relied on those misrepresentations, even if the competitor did not. *Lona's Lil Eats, LLC v. DoorDash, Inc.*, No. 20-CV-06703-TSH, 2021 WL 151978, at *10-12 (N.D. Cal. Jan. 18, 2021). Those cases focus on cases brought by a competitor of a business making false representations, and explain that "competitor plaintiffs are not concerned with the deceptive activity simply because it's deceptive. Competitor plaintiffs are concerned with the loss of sales and market share *as a result of* the deceptive activity." *Allergan USA Inc. v. Imprimis Pharms., Inc.*, 2017 WL 10526121, at *13 (C.D. Cal. Nov. 14, 2017)

---

[9] The *Meyer* opinion not once uses the term "reliance," and only uses the verb "rely" to discuss the legal justification for respondent's position. 45 Cal. 4th at 640.

(Carter, J.). *See also Lona's Lil Eats, LLC*, 2021 WL 151978, at *12. Consumers too can be concerned about the *results of* deceptive practices—a misleading or deceptive advertising practice may increase prices for all consumers because of the same market distorting effects that result in honest firms losing market share, *see Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1102-03 (1993) (noting that securities law allows investors to show price of security affected by how others were influenced by defendants' representations), or the practice can make it harder for consumers to find the true price of a product, wasting their time.[10] *See Meyer*, 45 Cal. 4th at 643.

### ii. Defendants' Use of Drip Pricing Likely Allowed Them to Charge Ms. Harvey More than She Would Have Paid

A reasonable jury could also conclude that Plaintiff paid more for the Jarle Chair Set because Defendants' delayed disclosure of the total price gave it a market advantage, and allowed it to set a higher price for the Chair Set than the market would otherwise bear.

Drip pricing results in consumers "pa[ying] more than they otherwise would have because of" the unlawful belated disclosure of the true price of a product, even if that specific consumer did not rely on the initial, incomplete price, *Clayworth*, 49 Cal. 4th at 788. Plaintiff's expert, Sebastien Bradley, explains that economic research into the effects of drip pricing shows that businesses benefit from drip pricing at consumers' (and competitors') expense. When consumers

[10] Allowing consumers like Plaintiff to show injury through causal mechanisms other than fraud is the best reading of *Kwikset* and *In re Tobacco II Cases*, both on their own reasoning and when considering the California Supreme Court's reasoning in *Meyer* and *Clayworth*. Admittedly, *In re Tobacco II Cases* includes some dicta that could be read as suggesting that any plaintiff challenging any unlawful misrepresentation must show reliance. 46 Cal. 4th at 326 ("this language imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong"). But the *In re Tobacco II Cases* and *Kwikset* also contain extensive passages explaining that "'as a result of' connotes an element of *causation*," *e.g. Kwikset*, 51 Cal. 4th at 326; that this causation element "mirrors how [the court] interpreted the same language in other consumer protection statutes such as the Consumers Legal Remedies Act" in *Meyer*, *id.*, and, most importantly, that the discussions set forth in those cases was limited to circumstances where the plaintiff was asserting (and only asserting) a "fraud theory." *Id.* at 326 & n.9; *In re Tobacco II Cases*, 46 Cal. 4th at 325-26 & n.17. Furthermore, *Meyer* and *Clayworth* each set forth an alternative means of showing injury caused by an unlawful practice without reliance: *Meyer* states that "the expenditure of . . . transaction costs to avoid the consequences of a deceptive practice" is sufficient for the CLRA, 45 Cal. 4th at 643, while *Clayworth* states in plain terms that causation is satisfied where a plaintiff "paid more than [she] otherwise would have because of a [business practice] in violation of state law." *Clayworth*, 49 Cal. 4th at 788. This reading of the cases also more closely hews to the voters' intent in adding a causation requirement to the UCL and FAL. "While the voters clearly intended to restrict UCL standing, they just as plainly preserved standing for those who *had* had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices." *Id.*

are exposed to drip pricing, they are, as a group, (1) more likely to make purchases, and (b) spend more on purchases than they would if provided transparent upfront pricing. Bradley Decl. ¶¶ 9-12, 15, 17. Consumers generally "underreact" to costs that are introduced later in the purchasing process; they are more likely to purchase a piece of furniture that is initially advertised for $250, but later disclosed to require payment of $50 in mandatory fees, than the same piece that is advertised for $300. *See id.* at ¶¶ 14, 17-18. These principles hold true regardless of whether the belated disclosure is a mandatory surcharge, or simply a sales tax. *Id.* at ¶¶ 16-18.

These well-understood principles affect how businesses price their goods. When businesses are allowed to use drip pricing, businesses set the total prices for goods and services at higher *total* prices than they would otherwise. *See* Bradley Decl. ¶¶ 9(b), 11-12. Prof. Bradley's own research shows that when airlines were required to include variable taxes as part of the advertised prices for international flights, airlines responded by *reducing* their base fares, and thus *reducing* the total cost paid by the consumer. Bradley Decl. ¶ 12.

Policymakers regulating drip pricing have long recognized that drip pricing makes goods more costly. The FTC explained in justifying its Rule on Unfair or Deceptive Fees: "When consumers are not provided total price at the beginning of the booking process, sellers likely are able to charge higher prices than under the final rule," which requires upfront disclosure. RJN Ex. A, 90 Fed. Reg. at 2149. *See also id.* at 2080 ("Bait-and-switch pricing and misleading fees . . . lead to higher prices than would be supported in a competitive marketplace."); *id.* at 2128 ("Drip pricing and the resulting imposition of additional search costs make it more difficult for consumers to compare prices across platforms, which may soften price competition in the market."); RJN Ex. B, Fed. Trade Comm'n, "That's the Ticket" Workshop: Staff Perspective 4 (May 2020) ("An economist explained that price obfuscation (hiding) causes prices to go up . . . ."). In fact, the FTC expected that regulating drip pricing would result in lower prices:

> [P]rices in the live-event ticketing and short-term lodging industries will adjust in response to the transparency facilitated by the rule. These price adjustments transfer welfare from one side of the market to the other; consumer welfare will increase, and producer profits will decrease by the same amount.

RJN Ex. A, 90 Fed. Reg. at 2080. The legislative history of S.B. 478—relying on the FTC—makes this same point:

> Junk fees impose substantial economic harms on consumers and impede the dissemination of important market information. . . . Junk fees force consumers either to accept a higher actual price for a service or product after beginning the transaction or to spend more time searching for lower actual prices elsewhere. Consumers faced with such fees *pay upward of twenty percent more* than when the actual price was disclosed upfront.

RJN Ex. D, S.B. 478, 2023-24 Leg. Sess., Sen. Floor Analysis 5 (Sept. 11, 2023) (emphasis added). Based on the academic literature and his own research into the effects of the DOT regulations requiring incorporation of taxes into the list price of airfare, Prof. Bradley has opined that had World Market not dripped the disclosure of the shipping and oversized item handling fees, and instead incorporated those fees into the list price of the Chair Set, as required by law, World Market would reduce the total price of the Chair Set—either by reducing the list price or reducing the mandatory fees. Bradley Decl. ¶ 25. Either way, World Market would have charged Plaintiff less.[11] This evidence allows a jury to conclude reasonably that Plaintiff was "forced to pay more" for the Jarle Chair Set than she would have otherwise paid; "in the eyes of the law," this is enough to show she was harmed by Defendants' practice. *Kwikset Corp.*, 51 Cal. 4th at 334. *See also id* at 323 (noting the quintessential form of economic injury is to "surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have"); *Clayworth*, 49 Cal. 4th at 788 (noting that the plaintiffs established standing because they "paid more than they otherwise would have because of a [business practice] in violation of state law").

### iii. Harvey Spent Money on Fees that Were Unlawful

A jury could also reasonably conclude that Plaintiff suffered harm as a result of Defendants' drip pricing scheme because she paid two fees that were not disclosed in the initial advertised price. The Ninth Circuit and the California Court of Appeal have held that "spen[ding] money on a product" that "defendant was allegedly not legally allowed to sell in the form being offered" is sufficient to show that defendant's practice resulted in harm. *Franz v. Beiersdorf, Inc.*,

---

[11] This path of showing causation does not depend on the plaintiff caring about the price, or relying on any representation by the seller. A billionaire may not care if he pays $500 for an item that he would have received for $400 had the unlawful practice not been used, but he has still lost $100 because of that practice.

745 F. App'x 47, 49 (9th Cir. 2018); *Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1, 13 (2012) (concluding that plaintiff had established causation where she paid money towards a motorcycle that defendant was not "allowed to sell at the price for which it was sold" because it had not disclosed "dealer-added charges on a hanger tag" as required by the Vehicle Code). *See also King v. Nat'l Gen. Ins. Co.*, No. 15-CV-00313-DMR, 2025 WL 1294657, at *22 (N.D. Cal. May 5, 2025) (applying *Medrazo*). This is exactly what happened here. Defendants sold Plaintiff a Chair Set after offering it to her through prohibited means: "offering a price . . . that does not include all mandatory fees or charges" other than government-imposed taxes and fees, and "[p]ostage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer." § 1770(29)(A). Defendants here offered a price for the good that did not include two mandatory fees: a "Shipping and Handling" fee and an "Oversized Item Surcharge" fee. Defendants have not asserted that these fees are exempt, and they cannot do so. The "Shipping and Handling" fee expressly covers *handling*, which covers internal costs of shipping, not "[p]ostage or carriage charges." "[A]s a result, [Plaintiff] spent money on a product that should not have been on the market" as it was priced. *Franz*, 745 F. App'x at 49.

### iv. For Her CLRA Claim, Plaintiff Can Show Defendants' Practices Resulted In Transactional and Opportunity Costs

For her CLRA claim, Plaintiff does not need to show she "lost money or property," *see Kwikset*, 51 Cal. 4th at 321-22; instead, she merely needs to show she "suffer[ed] 'any damage as a result of the use or employment' of an unlawful practice.'" *Meyer*, 45 Cal. 4th at 643. *See also id.* at 641 & n.1.[12] As *Meyer* explains, "the expenditure of . . . transaction costs to avoid the consequences of a deceptive practice falls within the broad meaning of" any damage. *Id.* at 643. So too does having to incur "opportunity costs," such as when a consumer is "diverted" from

---

[12] Defendants suggest without authority that the CLRA contains some exception for de minimis harm. Dkt. 43 at 14. *Meyer*, which Defendants do not address, expressly states that transactional costs are sufficient injury "whether or not those transaction costs are cognizable as 'actual damages.'" 45 Cal. 4th at 643. Defendants' theory is also contradicted by *Kwikset*, which states that a plaintiff only must show "an 'identifiable trifle' of economic injury." 51 Cal. 4th at 330 n.15. Defendants cite to *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946), which discusses the *de minimis* doctrine under federal wage and hour law. The California Supreme Court rejected this doctrine in *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 835 (2018). *See also* 29 C.F.R. § 785.47 ("working time amounting to $1 of additional compensation a week is not a trivial matter to a workingman.").

finding an alternative, more suitable product. *Id.* A reasonable jury could conclude that Plaintiff suffered both forms of damages.

A jury would almost certainly conclude that Defendants' failure to provide the full price of the Jarle Chair Set imposed search costs on Plaintiff. It took Plaintiff over 7 minutes after visiting the webpage for the Jarle Chair Set to learn of the true price charged by Defendants. Harvey Decl. Ex. A Nos. 120, 131. World Market's website plainly did not disclose to Plaintiff the true price of the Jarle Chair Set—or any of its other products—until she visited the *shopping cart page* of its website. *Id.* at ¶¶ 13-16. *See also* Bauer Decl. Exs. A-B. By contrast, had World Market lawfully displayed the fee-inclusive price, Plaintiff could have learned the Chair Set's true price before even clicking on the webpage dedicated to the Chair Set. *See* Harvey Decl. ¶ 11.

These facts alone would allow a jury to conclude that World Market made it more difficult for Plaintiff to compare the price of World Market's products with other products she had considered. Moreover, the Legislature repeatedly contemplated wasted time as a harm S.B. 478 was intended the address. The legislative history states that the bill would "[l]imit[] the time consumers waste shopping for a product or service that may, once junk fees are assessed, become excessively expensive or unaffordable," and "[e]nabl[e] direct, apples-to-apples price comparison, so that consumers can make informed purchasing decisions based on their preferences and budgets." Donald Decl. Ex. M at 5. *See also id.* (noting sponsor advocated for bill on basis that "[w]orking families . . . shouldn't have to waste their time trying to figure out what goods and services will really cost them and which advertised prices are false"). The FTC has likewise recognized that drip pricing wastes consumers' time:

> In a well-functioning market, consumers find it beneficial to comparison shop for low prices. When mandatory fees are obscured or misrepresented, however, consumers learn the full price at the end of the process and may need to re-assess whether they wish to purchase at a higher price than originally expected or to look for other options. Consumers incur longer search times to discover full prices and make informed purchasing decisions.

RJN Ex. A, 90 Fed. Reg. 2066, 2132. *See also id.* at 2128 ("[D]iscovering the lowest full price prior to a final purchase by going through the checkout process with multiple firms is inefficient

and involves additional consumer search costs."). These findings are based on extensive academic literature to which Prof. Bradley would testify at trial. Bradley Decl. ¶¶ 2(e), 17-19, 26.

A reasonable jury could also conclude that Plaintiff "incurred opportunity costs," because Defendants' delayed disclosure of mandatory fees "diverted [Plaintiff] from finding" a better chair set for her patio. *Meyer*, 45 Cal. 4th at 641. *See also id.* at 640 n.1 (defining opportunity cost). For example, had Plaintiff known that the Jarle Chair Set in fact cost over $500 before making the decision to purchase the chairs, her shopping experience may have resulted in her identifying a similar, but cheaper option. Those options certainly exist; Wayfair now sells a similar chair set for less than $300.[13] Warner Decl. ¶ 9, Ex. C. These facts suggest that Plaintiff was "diverted . . . from finding" a better option because of Defendants' practices.

### C. At Minimum, the Court Should Allow Plaintiff the Opportunity to Conduct Discovery that Could Result in Potentially Dispositive Evidence

Plaintiff has proffered ample evidence that would allow a jury to conclude that Plaintiff relied on the advertised price when purchasing the Chair Set; paid more for it because World Market could charge more for it while using an unlawful advertising practice; and was charged unlawful fees. (Much of this evidence, at this stage of the case, is uncontroverted in Plaintiff's favor.) For the CLRA claims, she has additionally proffered evidence showing she suffered both search costs and opportunity costs. But, if the Court still believes that Plaintiff has not proffered sufficient evidence to show "a causal connection or reliance on" the initial advertised price of $429.99, *Kwikset*, 51 Cal. 4th at 326, granting summary judgment to Defendants would *still* be improper. The nonmoving party "should be afforded reasonable access to potentially favorable information prior to the granting of summary judgment." *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982). *See also* Fed. R. Civ. Proc. 56(d). Here, the Court only opened discovery as to one issue: Harvey's reliance on the initial display price of the chairs. Dkt. 28 at 12. This limited scope of discovery prevented Plaintiff from obtaining information that could

---

[13] Defendants state: "Harvey elicited no evidence that she could have purchased the Jarle Chairs elsewhere, either at a lower price or with free shipping." Dkt. 43 at 14 n.10. World Market is the only company that sells the Jarle Chair Set; Plaintiff would similarly not be able to purchase any Kirkland Signature products for a lower price than at Costco. Plaintiff has now identified a *comparable* chair set sold "at a lower price [and] with free shipping." Warner Decl. ¶ 9, Ex. C.

show that Defendants' drip pricing scheme caused her harm. Warner Decl. ¶¶ 3-6. For example, Defendants may have information about how the Jarle Chair Set was priced prior to Defendants' decision to adopt additional mandatory surcharges. *Id.* at ¶ 4(a). If the price had been set lower than the total pre-tax price Plaintiff ultimately paid, this evidence would show that Plaintiff paid more because of Defendants' unlawful pricing scheme. *Id.* at ¶ 6. Defendants likely also have pricing strategy documents that discuss their decision to adopt mandatory surcharges and only disclose those charges at checkout. *Id.* at ¶ 4(b)-(d). This too could indicate that the unlawful drip pricing resulted in higher prices for Plaintiff. *Id.* at ¶ 6.

## VI.     CONCLUSION

Because a reasonable jury could reasonably conclude that Plaintiff relied on the initial advertised price of the Jarle Chair Set when purchasing the product, Defendants' motion must be denied. Accepting Defendants' theory that belated disclosure defeats reliance would in effect legalize the very conduct S.B. 478 was enacted to prohibit. The motion must also be denied because, even if Plaintiff did not rely on the initial advertised price, Plaintiff can show she was harmed "as a result of" Defendants' practices without proving she relied on the initial advertised price. She paid more for the Chair Set than she would have paid absent the unlawful use of drip pricing, and she paid two unlawful fees.

Respectfully submitted,

Dated: January 9, 2026

**OLIVIER & SCHREIBER PC
FINEMAN POLINER LLP**

*/s/ George A. Warner*
George A. Warner

*Attorneys for Plaintiff and the Putative Class*